IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CARLTON F. BACON,                         )
*Administrator of the Estate*             )
*of Mikal U. Bacon, deceased*,            )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        1:20cv1007
                                          )
STATE AUTO PROPERTY & CASUALTY            )
INSURANCE COMPANY,                        )
                                          )
            Defendant.                    )


## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) [of the Federal Rules of Civil Procedure (the 'Rules')]" (Docket Entry 11) (the "Dismissal Motion"). For the reasons that follow, the Court should grant the Dismissal Motion.

## BACKGROUND

Alleging violations of North Carolina law, Carlton F. Bacon, as Administrator of the Estate of Mikal U. Bacon, (the "Plaintiff") filed suit in North Carolina state court against State Auto Property & Casualty Insurance Company (the "Defendant") for Defendant's alleged "bad faith claim investigating, adjusting, appraising and negotiating, in addition to unfair and deceptive conduct" (Docket Entry 3 (the "Complaint"), ¶ 1). (<u>See generally</u>

Docket Entry 3.) After removing this action under the Court's diversity jurisdiction (see Docket Entry 1 at 2-3),[1] Defendant moved to dismiss Plaintiff's Complaint on the grounds that "it fails to state claims upon which relief can be granted" (Docket Entry 11 at 1). Plaintiff opposes the Dismissal Motion, contending that he "plead over 130 specific facts in his Complaint this Court must accept as true," and that, "[c]onstruing these facts in Plaintiff's favor, this Court should deny [the Dismissal M]otion." (Docket Entry 13 at 4.) According to the Complaint:

At all relevant times, Plaintiff possessed an insurance contract with Defendant that provided combined uninsured and underinsured motorist ("UIM") coverage (the "State Auto Policy"). (Docket Entry 3, ¶¶ 2, 32, 41, 45, 46.) "Plaintiff's decedent and natural son, Mikal [U. Bacon ('Mikal')]" (id., ¶ 3), "liv[ed] with [Plaintiff]" (id., ¶ 4), and "was a named insured driver on [the State Auto P]olicy and was an insured resident relative" (id., ¶ 3). "Plaintiff's State Auto Policy included UIM coverage available to himself and Mikal in the amount of $500,000.00 per person and $500,000.00 per accident." (Id., ¶ 48.) "Plaintiff voluntarily paid an extra premium for the UIM coverage on the State Auto Policy so that Plaintiff and his son would have the safeguard

---

    1  Docket Entry page citations utilize the CM/ECF footer's pagination.

of additional coverage in the event he or his son were injured or killed by someone with insufficient liability coverage." (<u>Id.</u>, ¶ 49.)

Mikal worked as a third-shift delivery truck driver for Ceva Logistics U.S., Inc. ("Ceva Logistics"). (<u>Id.</u>, ¶¶ 8, 51.) "During the early hours of June 17, 2017, Mikal was on the job . . . making deliveries throughout southeastern North Carolina." (<u>Id.</u>, ¶ 51.) "Around 4:40 a.m., Mikal was driving a 2016 Freightliner three-axle single unit box truck in an easterly direction on U.S. Highway 74 ('U.S. 74') approaching Chadbourn in Columbus County, North Carolina." (<u>Id.</u>, ¶ 52.) "This stretch of U.S. 74 is in a rural farming area that is completely unlit and very dark between four- and five o'clock in the morning." (<u>Id.</u>, ¶ 53.) "The speed limit on this stretch of U.S. 74 is 70 miles per hour, but Mikal was driving less than the speed limit at 65 miles per hour as he approached Chadbourn[]." (<u>Id.</u>, ¶ 54.) "Prior to Mikal's approach to Chadbourn, Michael Rice [('Rice')] parked his black 2008 Chevrolet sport utility vehicle halfway in the travel lane in which Mikal was traveling" (<u>id.</u>, ¶ 55) even though "there was nothing mechanically defective with [his] vehicle, and [Rice] had not run out of gas" (<u>id.</u>, ¶ 58). "Rice parked his vehicle in the dark in Mikal's travel lane without any lights or hazard indicators." (<u>Id.</u>, ¶ 56.) "Rice and his female companion left the vehicle to urinate in the woods." (<u>Id.</u>, ¶ 57.)

3

"At around 4:40 a.m., Mikal suddenly came upon Mr. Rice's unlit vehicle obstructing his lane, was not able to avoid it, causing Mikal to lose control of his box truck and run off the roadway." (Id., ¶ 59.) "Mikal's box truck hit a ditch and tree off the road to the right, causing the truck to turn over on its passenger side." (Id., ¶ 60.) Mikal managed to climb through one of the truck windows, but "collapsed on the side of the trailer, complaining of difficulty breathing." (Id., ¶ 62.) Shortly thereafter, Mikal died from "massive head and chest trauma from the motor vehicle accident" (id., ¶ 67) as EMS officials "were preparing to transport him to the hospital" (id., ¶ 66).

That same morning, "the North Carolina State Highway Patrol charged Mr. Rice with misdemeanor death by vehicle." (Id., ¶ 68.) Rice fled North Carolina, leading to issuance of a warrant for his arrest, which remained active as of the filing of the Complaint. (Id., ¶¶ 69-70.) The North Carolina Highway Patrol investigated the accident and produced a report in early July 2017. (See id., ¶ 71.) The police report attributed no contributing circumstances to Mikal, but noted that, per one witness, Rice and his companion smelled strongly of alcohol. (See id., ¶¶ 72-73.) Within days after the accident, "Ceva Logistics opened a Workers' Compensation

4

Claim, providing benefits based on Mikal's income in the year preceding his death of over $48,000.00." (Id., ¶ 74.)[2]

At the time of his death at age 39 (id., ¶ 11), Mikal financially supported his minor daughters, aged 12 and 7 (id., ¶ 75). "Plaintiff sought counsel for assistance with the liability and UIM claims for the benefit of his grandchildren, Mikal's two daughters." (Id., ¶ 76.) "Rice had Thirty Thousand No/100 dollars ($30,000.00) of liability insurance coverage through a Progressive Insurance affiliate ('Progressive'), at the time of the collision." (Id., ¶ 77.) "At the time of Mikal's injuries and subsequent death, he had his own insurance policy with State Farm Mutual Insurance Company ('State Farm'), and he duly paid for UIM benefits of $50,000.00 per person." (Id., ¶ 79.) As noted, Mikal also "was a named insured and resident relative insured on Plaintiff's [State Auto Policy], for which Plaintiff duly paid premiums for UIM benefits of $500,000.00 per person." (Id., ¶ 80.) On August 28, 2017, "Plaintiff's counsel opened up claims and sent letters of representation to Progressive, State Farm and Defendant." (Id., ¶ 81.) "Progressive and State Farm evaluated and resolved the

_____

    2    In May 2018, the North Carolina Industrial Commission resolved this claim, finding "that Mikal's two daughters, age 7 and 12 at the time of his death, were wholly financially dependent on Mikal and that they were entitled to receive compensation due under the Workers Compensation statute. Based on [Ceva Logistics] paying funeral expenses and compensation to Mikal's daughters, the total Workers Compensation payments would total around $380,000.00." (Id., ¶ 106.)

claims promptly, reasonably and good faith" (<u>id.</u>, ¶ 82), offering on October 4, 2017, and October 16, 2017, to tender their $30,000 and $50,000 policy limits, respectively (<u>id.</u>, ¶¶ 85-86). "By contrast, Defendant [] sought, from the beginning of the claim, to deny liability." (<u>Id.</u>, ¶ 83.)

More specifically, Defendant pursued a contributory negligence defense for the next two and a half years. (<u>See generally</u> <u>id.</u>, ¶¶ 83-155.) During this period, Defendant twice sought to inspect Mikal's truck (<u>see</u> <u>id.</u>, ¶¶ 89, 104), repeatedly sought records, including cell phone records, Mikal's employment records, ten years of Mikal's medical records, Mikal's June 2017 driving/travel log, and Ceva Logistics's driver safety protocol documents (<u>see, e.g.</u>, <u>id.</u>, ¶¶ 98, 104), as well as various law enforcement records relevant to the accident (<u>see, e.g.</u>, ¶¶ 101, 104, 112), and refused to negotiate, notwithstanding Defendant's counsel's requests for authority to negotiate (<u>see, e.g.</u>, <u>id.</u>, ¶¶ 141, 158). "On December 5, 2018, Plaintiff filed a wrongful death complaint with a demand for arbitration and request for a stay of the civil action pending arbitration." (<u>Id.</u>, ¶ 109.) "Plaintiff chose arbitration to resolve the claim faster than court and because it is allowed in the UIM policy drafted by Defendant." (<u>Id.</u>, ¶ 110.) "On February 15, 2019, Defendant [] answered Plaintiff's complaint, alleging contributory negligence and claiming that liability coverage must first be proven to be inadequate, even though Defendant [] was

6

already aware that liability carrier Progressive already offered its minimum [sic] limits coverage and UIM carrier State Farm had offered its UIM policy limits." (Id., ¶ 113.)

"On February 26, 2019, Defendant['s outside] counsel told Plaintiff's counsel that he knew that Progressive and State Farm wanted out of the case, but [Defendant's] adjuster would not resolve the case unless the contributory negligence defense becomes impossible to maintain." (Id., ¶ 114.) "During the same conversation on February 26, 2019, Defendant['s outside] counsel stated that he understood that Rice left his vehicle halfway in the roadway, but they were still wanting phone records, employment records and the law enforcement file." (Id., ¶ 115.) "Defendant['s] insistence on obtaining phone records, employment records and the law enforcement file were tactics [sic] intended to further delay payment of UIM benefits." (Id., ¶ 117.)

In March 2019, Plaintiff's counsel obtained, and provided to Defendant's counsel, pictures from the investigating Highway Patrol officer, including pictures of "the black Chevy Equinox that Mr. Rice left in the roadway" (id., ¶ 120), as well as the Highway Patrol "Fatal Packet" (id., ¶ 121). (Id., ¶¶ 120-21.) This packet contained more details from the investigation, including that (i) Rice admitted smoking marijuana and drinking alcohol prior to the accident, and smelled strongly of both substances when speaking with the officer at the scene of the accident, (ii) Rice's "[b]lack

7

vehicle [was] sitting half way in [the] road['s] east bound lane,"
(iii) Rice stopped his vehicle to urinate, (iv) "[t]here were no
mechanical problems with" the vehicle, (v) Rice indicated that he
"was heading from Myrtle Beach to Boston" following a night of
drinking to celebrate his birthday but he "was driving *eastbound* on
U.S. 74 away from Interstate 95 and back toward the coast," and
(vi) Rice and his girlfriend, a passenger in his vehicle, each
maintained an elevated blood alcohol concentration (a "BAC") for
multiple hours after the accident.  (Id., ¶ 124 (emphasis in
original) (internal quotation marks omitted).)  The packet also
contained the following witness statement from Tyler Helms:

> I seen the car in the middle of the road which I nearly
> hit myself.  I looked in my rear view mirror because I
> knew there was a Class B box truck I had just passed to
> make sure he didn't hit it.  Turns out he did.  CAR WAS
> IN THE MIDDLE OF THE ROAD!!!  NO FLASHERS OR
> INDICATORS!!!

(Id. (emphasis in original) (internal quotation marks omitted).)

On April 18, 2019, Defendant's outside counsel "conceded that
what Michael Rice did was 'extremely negligent.'"  (Id., ¶ 125.)
"Plaintiff's counsel reminded Defendant['s outside] counsel that
gross negligence on the part of a defendant precludes contributory
negligence as a defense.  Defendant['s outside] counsel stated that
his adjuster still wants things like driver logs.  Plaintiff's
counsel told Defendant['s outside] counsel that Plaintiff would not
be engaging in discovery and that if Defendant [] wanted things
like driver logs, it should request permission from the arbitration

panel." (Id., ¶ 126.) However, Defendant "never requested permission for written discovery from the arbitration panel." (Id., ¶ 127.)

On May 9, 2019, Plaintiff's counsel informed Defendant's counsel that the only cell phone records located for Mikal showed one telephone call at midnight on June 17, 2017, which call lasted only a minute. (Id., ¶ 133.) That same day, Defendant's counsel reported "that he had spoken with [Defendant's] adjuster and reported that Defendant [] did not deny liability or damages, they just needed more information about contributory negligence and that was why they were interested in phone records and employment records." (Id., ¶ 134.) Defendant's counsel further "acknowledged that Mr. Rice had been drinking and smoking marijuana and did not do well on the field sobriety test, but that he only had a BAC of 0.04 [four hours later] and was not charged with driving while impaired." (Id., ¶ 135 (brackets in original).) Finally, Defendant's counsel indicated that Defendant "was not taking the position that Mikal was grossly negligent on the level of Mr. Rice and that if contributory negligence was not an issue, the case was worth more than one million dollars." (Id., ¶ 136.)

On July 2, 2019, counsel discussed

Rice's gross negligence and recklessness. Plaintiff's counsel reiterated that gross negligence and recklessness is a defense to a claim of contributory negligence. Defendant['s outside] counsel acknowledged that the trooper noted the heavy smell of alcohol and marijuana and that Mr. Rice and his companion admitted to drinking

9

and smoking marijuana, but said that Mr. Rice was not charged with DWI even though he failed the field sobriety test. He said further that Rice's BAC was 0.06 which is not over the legal limit. Plaintiff's counsel again pointed out that this BAC was hours after Mikal died. Nevertheless, Defendant['s outside] counsel said it was not 100% clear that Mr. Rice was DWI and said that it would help if there is an appellate opinion that it is grossly negligent to leave a car in the roadway with no lights on. He concluded by stating that it is only established that DWI, street racing and excessive speed are grossly negligent, but not necessarily leaving a car in the roadway.

(<u>Id.</u>, ¶ 139.) Thereafter:

> On November 6, 2019, as the day for arbitration approached, Plaintiff's counsel again asked Defendant['s outside] counsel about whether Defendant [] had yet provided authority to negotiate. Defendant['s outside] counsel stated that they see this as a contributory negligence case but that counsel was interested in negotiation. He stated, again, that in the absence of contributory negligence the case was worth at least the policy limits. He also stated, again, that Mr. Rice's BAC was 0.04. Plaintiff's counsel repeated that this BAC was four hours later, that the BAC was 0.06 two and half hours later and that Mr. Rice failed the field sobriety test. Defendant['s outside] counsel stated that there was not enough evidence that Mr. Rice was impaired, and that he was not charged with DWI. He stated that he would be speaking with the adjuster for Defendant [] the next week.

(<u>Id.</u>, ¶ 141.)

The parties proceeded to arbitration on December 16, 2019. (<u>Id.</u>, ¶ 142.) Before the arbitration commenced that day, Plaintiff's counsel asked Defendant's counsel whether Defendant "had provided any authority to negotiate," and defense counsel confirmed that it had not. (<u>Id.</u>, ¶ 144.) "At the arbitration, Defendant['s outside] counsel repeated the same arguments upon

which the carrier refused to authorize negotiations, that Mr. Rice's BAC was 0.06 two and a half hours after Mikal was killed and 0.04 four hours later and that he was not charged with DWI." (Id., ¶ 145.) Defendant "did not present testimony or evidence from a toxicologist to corroborate its contention that Mr. Rice was not impaired at the time he left his vehicle in the roadway." (Id., ¶ 146.) Defendant also failed to interview Tyler Helms (the witness identified on the police report), Rice, or Plaintiff, and declined to present any live witnesses, instead submitting an affidavit from an accident reconstructionist that it previously had failed to disclose. (Id., ¶¶ 147, 150-51, 154, 177.) The arbitration panel then unanimously "awarded $2.48 million dollars in damages and expressly found that Mikal was not contributorily negligent" (id., ¶ 155). (See id., ¶ 156.) "The arbitration award was approximately 500% or five times the UIM policy limits." (Id., ¶ 157.) "After the arbitration concluded, Defendant['s outside] counsel admitted that he and his partner had been asking for authority to negotiate, but Defendant [] refused to allow them to negotiate." (Id., ¶ 158.)

Plaintiff subsequently commenced this lawsuit, challenging Defendant's actions in the investigation and handling of Mikal's estate's UIM claim. Specifically, Plaintiff brings a breach of contract claim (see id., ¶¶ 159-69) on the theory "that, among other things, Defendant [(i)] as of the [sic] October 2017, and at

11

the latest March 29, 2019, had all the information necessary to determine that the amount Plaintiff was legally entitled to recover as a result of the automobile collision exceeded the limits of UIM coverage sold by Defendant [] to Plaintiff" (id., ¶ 165) and (ii) "failed, refused, and neglected to pay or even offer Plaintiff the limits of his purchased UIM coverage in a timely and reasonable fashion, and failed, refused and neglected to pay Plaintiff the amount to which he was legally entitled" (id., ¶ 166). Plaintiff further asserts a claim for "Bad Faith/Breach of Covenant of Good Faith and Fair Dealing" (id. at 25 (emphasis and all-cap font omitted); see id., ¶¶ 170-81), based on Defendant's, inter alia, (i) failure to promptly pay UIM benefits after Plaintiff presented his claim, (ii) pursuit of a contributory negligence investigation in the face of Rice's "grossly negligent and reckless conduct" (id., ¶ 175), and (iii) refusal to negotiate. (See id., ¶ 177.) Plaintiff also pursues a claim for "Aggravated Bad Faith/Tortious Breach of Contract" (id. at 31 (emphasis and all-cap font omitted)), premised on the theory that Defendant (i) "knew or should have known that Plaintiff's UIM claim was valid and should have been offered [sic] at or around the time the other carriers, and especially fellow UIM carrier State Farm, offered their limits to resolve the wrongful death claim" (id., ¶ 197) and (ii) "refused to pay any part of Plaintiff's UIM claim even after it knew or should have known that it was a valid UIM claim with the ultimate

12

of damages, the loss of an active and supportive father with two young children" (id., ¶ 198). Finally, Plaintiff asserts a claim for "Unfair and Deceptive Trade Practices" (id. at 28 (emphasis and all-cap font omitted)) based on Defendant's alleged "Unfair Claims Settlement Practices" (id., ¶ 187) in violation of North Carolina General Statute Section 58-63-15(11). (See id., ¶¶ 182-95.)

## DISCUSSION

### I.  Motion to Dismiss Standards

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of App. of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). It "do[es] not, however, accept as true a legal conclusion couched as a factual allegation" nor does it "accept unwarranted inferences, unreasonable conclusions, or arguments." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) (internal quotation marks omitted). The Court "can further put aside any naked assertions devoid of further factual enhancement." Id. (internal quotation marks omitted).

13

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" cannot "survive a Rule 12(b)(6) motion." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

14

## II.  Analysis

Defendant moves to dismiss the Complaint primarily on the grounds that, under North Carolina law, it bore no obligation to pay UIM benefits until entry of judgment against Rice, and thus Plaintiff's claims, which all relate to Defendant's refusal to settle and pay UIM benefits prior to entry of such judgment, fail as a matter of law.  (See, e.g., Docket Entry 11 at 1.)  In response, Plaintiff argues that "Defendant incorrectly contends that a judgment must be obtained to establish breach of an insurance contract — and for there to be any UIM benefits at all. Defendant cites incorrect case law, as applied to this case, which would allow insurance carriers to engage in any unreasonable conduct up to the point of judgment — without consequence." (Docket Entry 13 at 4.)  Defendant's position should prevail.

As the United States Court of Appeals for the Fourth Circuit explained:

> UIM coverage is only triggered in certain circumstances. Under North Carolina law, "[u]nderinsured motorist coverage is deemed to apply when, by reason of payment of judgment or settlement, all liability bonds or insurance policies providing coverage for bodily injury caused by the ownership, maintenance, or use of the underinsured highway vehicle have been exhausted." N.C. Gen. Stat. § 20-279.21(b)(4).  Even once UIM liability is triggered, however, such liability is still "derivative and conditional," in that "[u]nless [the plaintiff] is 'legally entitled to recover damages' . . . from the uninsured motorist[,] the contract upon which he sues precludes him from recovering against defendant." *Brown v. Lumbermens Mut. Cas. Co.*, 285 N.C. 313, 204 S.E.2d 829, 834 (1974).  "To be 'legally entitled to recover damages' a plaintiff must not only have a cause of action

15

but a remedy by which he can reduce his right to damages to judgment." *Id.* at 833. Additionally, the amount due under the UIM policy "is conclusively determined in litigation against the [ ] motorist . . . ." *Chew v. Progressive Universal Ins. Co.*, No 5:09-CV-351-FL, 2010 WL 4338352, at *10 (E.D.N.C. Oct. 25, 2010) (first citing *Brown*, 204 S.E.2d at 834, then citing *McLaughlin v. Martin*, 92 N.C. App. 368, 374 S.E.2d 455, 456 (1988)). Therefore, under state law, a plaintiff is legally entitled to recover under a UIM policy only once a judgment is issued against the underinsured motorist determining liability and damages owed to the plaintiff. [The defendant insurer] was thus not required to settle [the plaintiff's] UIM claim until after it was determined that [the plaintiff] was legally entitled to recover from [the underinsured driver] — i.e., until after judgment was entered in [the plaintiff's lawsuit against the underinsured driver].

Elliott v. American States Ins. Co., 883 F.3d 384, 397-98 (4th Cir. 2018) (ellipsis and certain brackets in original).

Relying on Elliott, Defendant asserts that Plaintiff's claims fail as a matter of law because they all "relate to [Defendant's] alleged failure to provide [UIM benefits] under an insurance policy and alleged unfair settlement practices in that regard," but the Complaint fails to allege entry of a "valid judgment against [Rice] determining both liability and damages." (Docket Entry 11 at 1.)[3] Plaintiff counters that "Defendant's out-of-context read of *Elliott*" as "provid[ing] no right to UIM benefits absent a valid judgment . . . . is unfounded and indefensible as to the results

---

3 Defendant further contends that the arbitration award does not constitute a valid judgment for UIM purposes. (See, e.g., Docket Entry 12 at 8.) The Court need not resolve that contention, however, as Plaintiff does not allege a failure to pay UIM benefits after entry of the arbitration award. (See generally Docket Entry 3.)

16

such an interpretation would yield." (Docket Entry 13 at 5; <u>see</u> <u>also</u> <u>id.</u> ("Applying *Elliott* universally would allow insurance carriers to engage in any unreasonable conduct prior to judgment and would inundate the state and federal court systems with UIM claimants seeking judgments. This is an absurd result North Carolina law could not have intended . . . .").)

In Plaintiff's view,

> *Elliott* is not intended for a breach of contract claim.
> Further, the quote Defendant utilizes in its brief
> demonstrates *Elliott* is not based in sound North Carolina
> law. Specifically, *Elliott* cites *Brown*, 285 N.C. 313,
> 285 S.E.2d 829, and notes, "Even once UIM liability is
> triggered, however, such liability is still 'derivative
> and conditional,' in that '[u]nless [the plaintiff] is
> 'legally entitled to recover damages' . . . from the
> uninsured motorist[,] the contract upon which he sues
> precludes him from recovering against defendant.'"
> *Elliott*, 883 F.3d at 397-98, [sic] (quoting *Brown*, 285
> N.C. at 319, 285 S.E.2d at 834). A careful reading of
> the *Brown* decision makes clear this quote is not
> applicable to the *Elliott* decision as Defendant seeks to
> use it under the circumstances here.
>
> In *Brown*, the plaintiff sought to utilize a
> three-year breach of contract statute of limitations
> after the two-year wrongful death statute had run. *Id.*
> On this question, the North Carolina Supreme Court
> determined a plaintiff must have a legal cause of action
> against the motorist in order to maintain a cause of
> action in contract. *Id.* ("We perceive no reason why
> plaintiff should have three years to sue the insurance
> company when he had only two in which to sue the
> individual primarily liable."). Reading *Elliott* in the
> proper context (no breach of contract claim raised), as
> well as taking into account the *Elliott* decision's basis
> in state law from *Brown*, this Court should not follow
> *Elliott*'s rationale and instead apply the proper rule,
> whether Plaintiff is legally entitled to recover under
> the policy when he has a cause of action and a remedy.

17

To accept Defendant's erroneous interpretation of
North Carolina law that there is no triggering of
coverage here because "under state law, a plaintiff is
legally entitled to recover under a UIM policy only once
a judgment is issued against the underinsured motorist
determining liability and damages owed to the plaintiff,"
*Elliott*, 883 F.3d 398, would produce "an absurd and
unjust result" not contemplated under the law.  Such a
determination allows insurers, like Defendant, in the
face of overwhelming evidence supporting a claim, to
refuse to negotiate in all cases, abdicating its duty to
the courts to resolve.  This contravenes and frustrates
the very obligations of insurance companies to their
insureds under North Carolina law. *See* N.C. Gen. Stat.
§ 20-279.21[;] N.C. Gen. Stat. § 58-63-15(11).
Defendant's conduct in failing to recognize Plaintiff's
valid claim after the liability carrier tendered
constitutes a breach of contract with its insured.  State
Farm, an equally situated UIM carrier, offered its policy
limits, which further demonstrates Defendant's wrongful
conduct.  This Court should deny Defendant's motion to
dismiss on the breach of contract claim.

(Docket Entry 13 at 10-12 (ellipsis and certain brackets in
original) (footnote omitted).)

Plaintiff's arguments fall short.  First, <u>Elliott</u> did not
limit its interpretation of UIM law to "unfair claims settlement
practice action[s and] *per se* unfair and deceptive trade practices
action[s]" (<u>id.</u> at 6), but rather examined North Carolina's UIM law
generally, <u>see</u> <u>Elliott</u>, 883 F.3d at 397-98.  Accordingly, its
interpretation of North Carolina's UIM law applies equally to
breach of contract claims as to unfair claims settlement
allegations.  Thus, even assuming "*Elliott* is not based in sound
North Carolina law" (Docket Entry 13 at 10), this Court must follow
<u>Elliott</u> in resolving the Dismissal Motion.  <u>See, e.g.,</u> <u>Boone v.</u>
<u>Board of Governors of Univ. of N.C.</u>, No. 1:17cv113, 2018 WL

18

1620971, at *3 (M.D.N.C. Mar. 30, 2018) ("Moreover, despite [the p]laintiff's misguided characterization of binding Fourth Circuit precedent as 'deeply flawed' and 'useless,' as a district court within the Fourth Circuit, this Court is obligated to follow Fourth Circuit precedent." (citation omitted)).

Furthermore, contrary to Plaintiff's contentions, Elliott sets forth a sound reading of North Carolina law. For instance, the North Carolina Supreme Court has endorsed various decisions applying the principle "that a U[I]M carrier's liability does not attach until a valid judgment is obtained against an uninsured motorist," Grimsley v. Nelson, 342 N.C. 542, 547, 467 S.E.2d 92, 95 (1996) (internal quotation marks omitted). See id. at 547-48, 467 S.E.2d at 95-96. The North Carolina Supreme Court noted:

> These cases are consistent with the language of [North Carolina General Statute] § 20-279.21(b)(3)a, which provides that all insurance policies in the State will be deemed to include a provision that "the insurer shall be bound by *a final judgment* taken by the insured against an uninsured motorist," N.C.[ Gen. Stat.] § 20-279.21(b)(3)a (emphasis added), providing the insurer is served with a copy of summons and complaint.

Grimsley, 342 N.C. at 548, 467 S.E.2d at 96 (emphasis in original) (concluding that, where "the trial court correctly dismissed the action against [the alleged uninsured motorist due to insufficient service of process]," it also "correctly dismissed the action against [the UIM insurance company]," whose "only obligation in this case would be to pay any judgment entered against defendant [uninsured motorist]"). The North Carolina Supreme Court has

19

further recognized that, although "[t]he words 'legally entitled to recover'" in the UIM statute "are subject to other interpretations," in North Carolina, "'legally entitled to recover' should be construed to mean that the carrier's UIM liability is derivative in nature." Silvers v. Horace Mann Ins. Co., 324 N.C. 289, 294, 378 S.E.2d 21, 25 (1989) (observing that, in contrast to North Carolina, Oklahoma's Supreme Court construes phrase to "simply mean that the insured must be able to establish fault on the part of the uninsured motorist which gives rise to damages and prove the extent of those damages" (internal quotation marks omitted)).

In sum, "[t]herefore, under [North Carolina] law, a plaintiff is legally entitled to recover under a UIM policy only once a judgment is issued against the underinsured motorist determining liability and damages owed to the plaintiff." Elliott, 883 F.3d at 398. "[Defendant] was thus not required to settle [Plaintiff's] UIM claim until after it was determined that [Plaintiff] was legally entitled to recover from [Rice] — i.e., until after judgment was entered in *[Plaintiff] v. [Rice]*. With this in mind, [the undersigned] address[es Plaintiff's] specific arguments." Id.

Plaintiff first asserts that Defendant breached the State Auto Policy by failing to promptly pay UIM benefits. (See Docket Entry 3, ¶¶ 159-69.) Under North Carolina law, a breach of contract claim requires two elements: a valid contract between the parties

20

and a breach of a contractual term. See Lake Mary Ltd. P'ship v. Johnston, 145 N.C. App. 525, 536, 551 S.E.2d 546, 554 (2001). Although the Complaint alleges the existence of a valid contract between the parties, it does not allege a failure to pay UIM benefits after entry of a judgment against Rice determining liability and damages. (See generally Docket Entry 3.) Rather, Plaintiff complains that Defendant acted improperly in requiring Plaintiff to pursue such a judgment against Rice. (See id.) Because Defendant bore no obligation to pay UIM benefits prior to entry of valid judgment against Rice, Plaintiff's breach of contract claim fails as a matter of law. See, e.g., Chew, 2010 WL 4338352, at *7-8 (finding no breach of contract where insurance company refused to pay UIM benefits until after entry of arbitration award against uninsured motorist and observing that "North Carolina courts have consistently rejected the view that an insured may sue an insurance company for breach of contract for failure to pay uninsured motorist benefits, instead holding that such actions take the form of a tort against the uninsured motorist, which the insurance company may defend," id. at *7).

As for Plaintiff's claim for bad faith/breach of the covenant of good faith and fair dealing, this Court (per Chief United States District Judge Thomas D. Schroeder) has previously explained:

> "In addition to its express terms, a contract contains all terms that are necessarily implied 'to effect the intention of the parties' and which are not in conflict with the express terms[,]" and these implied

21

terms include "the 'basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement.'" Maglione v. Aegis Family Health Ctrs., 607 S.E.2d 286, 291 (N.C. Ct. App. 2005) (first quoting Lane v. Scarborough, 200 S.E.2d 622, 624 (1973); and then quoting Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 253 S.E.2d 625, 627 (1979)). "All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose." Id. "[W]here a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its claim for breach of contract, [courts] treat the former claim as 'part and parcel' of the latter." Cordaro v. Harrington Bank, FSB, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018) (quoting Murray v. Nationwide Mut. Ins. Co., 472 S.E.2d 358, 368 (1996), disc. review denied, 483 S.E.2d 172-73 (1997)); see also Suntrust Bank v. Bryant/Sutphin Props., LLC, 732 S.E.2d 594, 603 ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts."), disc. review denied, 735 S.E.2d 180 (2012).

Grimes v. Government Emps. Ins. Co., No. 1:18-cv-798, 2019 WL 3425227, at *10 (M.D.N.C. July 30, 2019) (brackets in original).

Plaintiff's claims for breach of contract and breach of the implied covenant of good faith rest on the same conduct, namely Defendant's handling of Plaintiff's UIM claim. (See Docket Entry 3, ¶¶ 159-81.) Because Plaintiff's breach of contract claim fails, so too does his claim for violation of "the implied covenant of good faith and fair dealing." Grimes, 2019 WL 3425227, at *10. The Court should therefore dismiss that claim.

22

In addition, "[u]nder North Carolina law, bad faith breach of contract is not a recognized cause of action independent of a claim for breach of contract; rather, bad faith is a circumstance which may justify granting punitive damages for a breach." Id. at *11. "Because the [C]ourt [should] dismiss[ Plaintiff's] breach of contract claim, [his] claim for bad faith breach necessarily fails." Id. As such, the Court should grant Defendant's request to dismiss that claim as well.

Finally, Plaintiff maintains that Defendant violated North Carolina's Unfair and Deceptive Trade Practices Act (the "UDTPA"). (See Docket Entry 3, ¶¶ 182-95.) The UDTPA, North Carolina General Statute Section "75-1.1, prohibits unfair and deceptive acts or practices, generally, and North Carolina's 'Unfair Claim Settlement Practices' statute, N.C. Gen. Stat. § 58-63-15(11) [(the 'UCSP')], defines unfair practices in the settlement of insurance claims." Elliott, 883 F.3d at 396. Although Section "58-63-15(11) provides that the Commissioner of Insurance has the authority to enforce the provisions of that subsection," Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 69, 529 S.E.2d 676, 682 (2000),[4] the conduct it prohibits can "support a finding of unfair or deceptive acts or practices" under the UDTPA, id. at 71, 529 S.E.2d

_____

    4  More specifically, the statute "create[s] a[] cause of action in favor of . . . the Commissioner" when an insurance company "[c]ommit[s] or perform[s] with such frequency as to indicate a general business practice" any of fourteen specified actions. N.C. Gen. Stat. § 58-63-15(11).

at 683.  Accordingly, for private plaintiffs, "the remedy for a violation of section 58-63-15 is the filing of a section 75-1.1 claim."  <u>Country Club of Johnston Cnty., Inc. v. United States Fid. & Guar. Co.</u>, 150 N.C. App. 231, 244, 563 S.E.2d 269, 278 (2002) (internal quotation marks and emphasis omitted).  "Thus, an individual may file an independent [Section] 75-1.1 claim, or may file a [Section] 75-1.1 claim that relies on a violation of § 58-63-15(11)."  <u>Elliott</u>, 883 F.3d at 396.

In this regard, the Fourth Circuit has observed:

> To establish a violation of § 58-63-15(11), a complainant must show that the defendant committed one of the enumerated unfair practices in the settlement of insurance claims, and that such conduct was committed or performed "with such frequency as to indicate a general business practice."  [N.C. Gen. Stat.] § 58-63-15(11). To establish a claim under § 75-1.1(a), a complainant must show:  (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused injury to plaintiff.  *Gray*, 529 S.E.2d at 681. "The determination of whether an act or practice is an unfair or deceptive practice . . . is a question of law for the court."  *Id.* (citation omitted).  "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 653 S.E.2d 393, 398 (2007) (internal quotation marks omitted).  However, "such conduct that violates [§ 58-63-15(11)] constitutes a violation of [Section] 75-1.1, as a matter of law, without the necessity of an additional showing of frequency indicating a 'general business practice,'" because "such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers . . . ."  *Gray*, 529 S.E.2d at 683 (holding as to violations of § 58-63-15(11)(f), specifically); *Country*

> *Club*, 563 S.E.2d at 279 (extending *Gray* to apply to all
> conduct described in § 58-63-15(11)).

*Elliott*, 883 F.3d at 396 (ellipses and second set of brackets in
original).[5]

According to Plaintiff, he "pleads violations of both N.C.
Gen. Stat § 58-63-15(11) and N.C. Gen. Stat. §75-1.1 in *seriatim*."
(Docket Entry 13 at 15.)  As to the UCSP, the Complaint asserts
violations of seven subsections of North Carolina General Statute
Section 58-63-15(11) (*see* Docket Entry 3, ¶ 187 (citing N.C. Gen.
Stat § 58-63-15(11)(b)-(d), (f)-(h), & (n))), but Plaintiff
discusses only five subsections in his opposition to the Dismissal
Motion (*see* Docket Entry 13 at 15-17 (not addressing N.C. Gen. Stat
§ 58-63-15(11)(b) & (n)).  As such, Plaintiff effectively concedes
that his claims under the omitted subsections, which prohibit
"[f]ailing to acknowledge and act reasonably promptly upon
communications with respect to claims arising under insurance
policies," N.C. Gen. Stat. § 58-63-15(11)(b), and "[f]ailing to
promptly provide a reasonable explanation of the basis in the

---

        5  As the Fourth Circuit also noted, "it is unclear whether
conduct that violates § 58-63-15(11) is a per se violation of
§ 75-1.1, or instead whether that conduct satisfies § 75-1.1's
conduct requirement of an unfair or deceptive act or practice,
still requiring the complainant to show that the act or practice
was in or affecting commerce and proximately caused injury to the
plaintiff before finding a violation of § 75-1.1." Id. at 396 n.7
(collecting cases). Because, as discussed below, Plaintiff "failed
to plausibly state a claim that [Defendant] committed any of the
conduct prohibited in § 58-63-15(11), however, it is unnecessary to
resolve this question." Id.

insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement," N.C. Gen. Stat. § 58-63-15(11)(n), should be dismissed. See, e.g., Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (explaining that party concedes opponent's argument by failing to address it in party's response and collecting cases). In any event, the Complaint does not contain factual allegations that support violations of said subsections (see generally Docket Entry 3), necessitating dismissal of such claims, see Iqbal, 556 U.S. at 678.

The Complaint similarly lacks any factual allegations establishing that Defendant "[f]ail[ed] to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies," N.C. Gen. Stat. § 58-63-15(11)(c) (emphasis added). (See generally Docket Entry 3.) As to that matter, Plaintiff emphasizes that, "[i]n less than two months from the date Plaintiff opened claims against all insurance carriers, both Progressive and State Farm promptly evaluated the claims and offered policy limits" (Docket Entry 13 at 15), but Defendant conducted a lengthy investigation into the accident (id. at 15-16), rendering Defendant's actions "anything but prompt, reasonable or in good faith" (id. at 16). Although Plaintiff takes issue with Defendant's actual investigation, he fails to provide any factual support for his conclusory assertion that "Defendant failed to

26

adopt and implement reasonable <u>standards</u> for the prompt investigation of claims arising under the policy" (<u>id.</u> at 15 (emphasis added)). (<u>See</u> <u>id.</u> at 15-16; <u>see generally</u> Docket Entry 3.) Accordingly, Plaintiff fails to state a viable claim for violation of Section 58-63-15(11)(c). <u>See</u> <u>Iqbal</u>, 556 U.S. at 678; <u>SD3</u>, 801 F.3d at 422; <u>see also</u> <u>Whitworth v. Nationwide Mut. Ins. Co.</u>, No. 1:17cv1124, 2018 WL 4494885, at *7 (M.D.N.C. Sept. 19, 2018) (recommending entry of summary judgment against plaintiffs where defendant insurance company provided guidelines for its appraisers and plaintiffs "neither directly contend that [defendant's] alleged failure to adhere to corporate policies contravenes Section 58-63-15(11)(c) nor provide any support for such proposition," and observing that "it seems unlikely that the mere failure to follow established procedures, without more, would contravene Section 58-63-15(11)(c), given that the UCSP appears focused on systemic issues in handling insurance claims"), <u>report and recommendation adopted</u>, No. 1:17cv1124, 2018 WL 6573472 (M.D.N.C. Oct. 19, 2018); <u>Cash v. State Farm Mut. Auto. Ins. Co.</u>, 137 N.C. App. 192, 199, 528 S.E.2d 372, 376 (affirming dismissal where "plaintiff allege[d] that [the defendant's] investigation was not adequate," but did not allege that defendant "failed to 'adopt and implement *reasonable standards for the prompt investigation* of claims arising under' plaintiff's policy" (emphasis in original)), <u>aff'd</u>, 353 N.C. 257, 538 S.E.2d 569 (2000).

27

Plaintiff next contends that Defendant "[r]efus[ed] to pay claims without conducting a reasonable investigation based upon all available information," N.C. Gen. Stat. § 58-63-15(11)(d), on the theory that "Defendant refused to recognize a valid claim and made no offers to pay throughout the pendency of the claim" (Docket Entry 13 at 16). However, the Complaint challenges only conduct arising before entry of the arbitration award in Plaintiff's suit against Rice. (See generally Docket Entry 3.) Accordingly, Plaintiff fails to state a valid claim based on this subsection. See Elliott, 883 F.3d at 398 (explaining that insurer bears no obligation to pay UIM claims until after judgment entered against tortfeasor).

Plaintiff further asserts that Defendant did "[n]ot attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," N.C. Gen. Stat. § 58-63-15(11)(f) (emphasis added), and "[c]ompell[ed Plaintiff] to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in [Plaintiff's] action[ against Rice]," N.C. Gen. Stat. § 58-63-15(11)(g) (emphasis added). (See Docket Entry 3, ¶ 187; Docket Entry 13 at 16-17.) Plaintiff fails to "plausibly state a claim upon which relief can be granted based on th[ese] subsection[s] because liability did not become reasonably clear until after a judgment [or, at a minimum, an arbitration award] was

28

entered in [Plaintiff's suit against Rice] and, consequently, [Defendant] had no obligation to settle [Plaintiff's] claim before this time." Elliott, 883 F.3d at 398.

Finally, Plaintiff asserts that Defendant violated Section § 58-63-15(11)(h), which prohibits "[a]ttempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled," N.C. Gen. Stat. § 58-63-15(11)(h). (See Docket Entry 3, ¶ 187; Docket Entry 13 at 17.) According to Plaintiff, "Defendant's refusal to make an offer under the[] circumstances is worse than attempting to settle a claim for less than a reasonable man would have believed he was entitled." (Docket Entry 13 at 17.) However, Plaintiff provides no authority for the proposition that failing to engage in settlement negotiations constitutes an attempt to settle a claim for less than its value in contravention of Section 58-63-15(11)(h). (See id.) Accordingly, Plaintiff does not plausibly allege that Defendant violated this subsection by "refus[ing] to offer anything" (id.).

Because Plaintiff "failed to state a claim upon which relief could be granted under § 58-63-15(11), [he] consequently also failed to state a claim upon which relief could be granted under § 75-1.1, as a matter of law." Elliott, 883 F.3d at 399. Thus, the Court should dismiss Plaintiff's USCP-based UPTPA claim. See id. Plaintiff argues, however, that he "established a separate cause of action under [Section] 75-1.1," independent of his USCP

29

claims. (Docket Entry 13 at 17.) More specifically, Plaintiff contends:

> First, Defendant's refusal to recognize and pay any part of Plaintiff's UIM claim even after it knew or should have known it was a valid claim involving the loss of a father to two young children constitutes an unfair or deceptive act or practice. Defendant's conduct is further exacerbated by the fact that the other carriers, including another UIM carrier, offered their limits in less than two months. Instead, Defendant accused Mikal of contributory negligence and maintained that position as additional facts only exacerbated Rice's gross negligence, willful and wanton conduct. Based upon the evidence presented, the only logical conclusion is that Defendant never sought to consider Plaintiff's claim, even though its own counsel sought authority to negotiate and settle. No factual issue would have changed Defendant's mind.

(Id. at 17-18; see also id. at 18 (asserting that Defendant's failure to pay UIM benefits prior to litigation "after years of [Plaintiff's] premium payments affects commerce").)

As discussed, however, Defendant bore no obligation to pay UIM benefits until Plaintiff obtained a judgment against Rice establishing both liability and damages. Moreover, "[a]ny defense available to [Rice as] the uninsured tort-feasor [w]ould be available to [Defendant, as the UIM] insurer" in defending against Plaintiff's claim. Brown, 285 N.C. at 319, 204 S.E.2d at 834. Accordingly, Defendant's pursuit of a contributory negligence defense and refusal to pay Plaintiff's UIM claim prior to issuance of the arbitration award against Rice fails to plausibly state a UDTPA claim. See, e.g., Elliott, 883 F.3d at 399 ("The mere fact of having UIM coverage does not entitle the insured to recover at

30

all, or to recover the maximum amount of coverage.").  The Court should therefore grant Defendant's request to dismiss Plaintiff's UDTPA claim.

**CONCLUSION**

Under North Carolina law, Defendant bore no obligation to pay UIM benefits prior to entry of a judgment against Rice determining both liability and damages.  As such, Plaintiff fails to plausibly allege that Defendant breached the State Auto Policy or engaged in unfair and deceptive trade practices.

**IT IS THEREFORE RECOMMENDED** that the Dismissal Motion (Docket Entry 11) be granted.

This 1st day of June, 2021.

/s/ L. Patrick Auld<br>**L. Patrick Auld**<br>**United States Magistrate Judge**

31